NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0515n.06

No. 15-3244

**FILED**
Sep 02, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

R.C. CRUM, JR.,                                  )
                                                 )
    Plaintiff-Appellant,                       )
                                                 )        ON APPEAL FROM THE UNITED
v.                                               )        STATES DISTRICT COURT FOR
                                                 )        THE NORTHERN DISTRICT OF
COMMISSIONER OF SOCIAL SECURITY,                 )        OHIO
                                                 )
    Defendant-Appellee.                        )        OPINION
                                                 )
                                                 )

BEFORE:    BOGGS, SUTTON, and STRANCH, Circuit Judges.

**PER CURIAM.**    R.C. Crum, Jr. appeals the district court's judgment affirming the decision of the Commissioner of Social Security to deny his applications for Supplemental Security Income and Child's Insurance Benefits. Crum alleges that the Administrative Law Judge erred in deciding that Crum's impairments did not meet or equal a listed disability, and failed to properly consider the opinions of the State consultative examiner and Crum's primary-care physician. For the reasons set forth below, we affirm the decision of the district court.

I.

Crum filed his benefits applications on October 13, 2010, citing a learning disability and a gastrointestinal disorder resulting from gunshot injuries. The ALJ held a hearing on May 15, 2012. Crum was represented by counsel and testified at the hearing, as did a vocational expert. In a written decision issued June 27, 2012, the ALJ denied Crum's application for benefits. She

found that Crum suffered from severe impairments due to his gastrointestinal disorder and borderline intellectual functioning. However, she determined that Crum had the residual functional capacity to perform unskilled work at a medium exertion level. The Appeals Council denied Crum's request for review. Crum filed this lawsuit seeking judicial review of the denial of benefits, and the district court affirmed.

## II.

Crum is twenty-six years old. He resides with his mother and has never lived independently. He attends to his own personal hygiene, does chores around the house, and sees his four children regularly. He enjoys limited recreational activities like spending time with his family, playing cards, and singing in a church choir. Crum was issued a driver's license after taking the test orally for the third time. He does not have a car, but can ride the bus if he does not have to transfer. Though Crum has applied for jobs, with his mother helping to fill out the applications, he has never received an offer of employment.

Crum was initially evaluated and placed in Cleveland Metropolitan School District's cognitive disabilities program around the age of nine. By the time he was nineteen, he had reached the tenth grade. At this time, he read at a beginning third-grade level, spelled at a beginning second-grade level, and had math-computation and reasoning skills that fell "way below grade level expectancy." AR 259–60. His special education teacher noted in a 2008 school evaluation that "[Crum] is able to work independently and is able to complete classroom work. He accepts supervisory authority and cooperates with others. [Crum] has the ability to follow verbal, written, multi-step directions. He also has the ability to plan and organize." *Id*. at 261. However, "[Crum] does not attend school on a regular and consistent basis. He has a poor sense of responsibility and dependability." *Id*.

In an IQ test administered as part of the 2008 school evaluation, Crum earned a verbal score of 69, a nonverbal score of 80, and an IQ composite score of 71. He placed in the bottom three percent of individuals his age. Crum progressed no further in school. He testified that he tried to get his GED, but was informed he would not pass given his reading and comprehension skills. The same year, he was convicted on a charge of "strong-arm robbery" and was placed on probation and, at the time of the hearing before the ALJ, he met with his parole officer monthly.

In the coming years, Crum underwent two additional intelligence tests. The State psychological consultant Dr. Leach administered these tests in connection with Crum's applications for disability benefits. In December 2009, when Crum was 20 years old, he received a full scale IQ score of 70, which Dr. Leach considered "within the borderline range of intellectual ability." *Id*. at 409. When Crum was tested again in 2011, he received a full-scale IQ score of 74, also considered "borderline." *Id*. at 505. This score placed Crum in the fourth percentile for individuals his age.

In addition to a learning disability, Crum suffers from a gastrointestinal disorder caused by a gunshot wound to his abdomen sustained in April 2007. He underwent an exploratory laparotomy for resection of the colon and an incidental appendectomy. Crum suffered a second gunshot wound in his leg in the summer of 2007, but treated it himself rather than seeking medical attention.

Though his incisions healed well, Crum has since experienced chronic abdominal pain, possible small-bowel obstructions, and constipation. These symptoms frequently send him to the emergency room. Crum testified that he experiences severe pain when he eats solid foods and therefore subsists on oatmeal and candy. His pain is aggravated by activity, such as lifting heavy objects or walking or standing for a period of approximately 20 minutes, depending on the state

of his stomach. He takes the pain medication Tramadol, which "help[s] a little, but [not] all the time." *Id*. at 61.

Doctors prescribed additional revision surgery. Crum missed a number of evaluative appointments and has not yet had the second surgery. He has also postponed a prescribed contrast enema study. Crum attributes his reticence to the fear he might require a colostomy bag and his lack of health insurance.

Vocational expert Brett Sulken testified at the hearing before the ALJ. Sulken was unable to identify any past relevant work for Crum based on Crum's testimony. The ALJ posed two hypotheticals to Sulken. First, she asked him to consider:

> [A] person with the same age, education, and past work as the claimant who can perform a full range of exertional work, and . . . is able to perform simple, routine tasks, or unskilled work with superficial interpersonal contact with co-workers, supervisors, and the general public, and without strict time or production demands. In addition, this hypothetical individual has limited [reading] skills such that it is best if they receive oral instructions, and can ask questions in a small or solitary setting, and can cope with the ordinary and routine changes in a work setting which is not fast paced or of high demand.

*Id*. at 65. The ALJ clarified that the working environment in this hypothetical would be "a one-on-one situation where instructions could be given orally" by a supervisor. *Id*. at 66. In response, Sulken identified jobs appropriate to these limitations that were available in the national economy, including cleaner, dishwasher, and laundry worker. His assessment remained unchanged with an additional limitation that the hypothetical individual "would require a 15-minute break every two hours." *Id*. at 66–67.

The ALJ added a final limitation and asked Sulken to "assume the hypothetical individual would be absent from work approximately four to five days per month." *Id*. at 67. In light of this addition, the vocational expert adjusted his assessment. He testified that the hypothetical

individual would not be able to perform the jobs he had identified, nor was there any alternative job that that hypothetical individual could perform.

The ALJ then presented a new hypothetical:

> [A] person with the same age, education, and past work as [Crum] who can occasionally lift 20 pounds and frequently lift 10 pounds. Can stand and walk two hours in an eight-hour workday, 30 minutes at a time, and can sit for six hours of an eight-hour workday? In addition, this hypothetical individual is able to perform simple, routine tasks, or unskilled work with superficial interpersonal contact with co-workers, supervisors, and the general public, without strict time or production demands. In addition, this hypothetical individual has limited reading such that they need to receive oral instructions and ask questions in a small or one-on-one setting with their supervisor. In addition, this hypothetical individual can cope with ordinary and routine changes in a work setting which is not fast paced, or of high demand.

*Id*. at 67–68. Sulken could not identify any jobs appropriate for this hypothetical individual. He explained that, for a worker who sat for six hours a day, "reading and writing, and . . . production hand skills, become very important," and because he understood the ALJ's hypothetical to rule out these skills, he could think of no jobs that suited the second hypothetical person. *Id*. at 68.

Sulken then considered questions about workplace supervision posed by Crum's counsel. He testified that a limitation requiring more supervision than "the normal average peer worker" was not "consistent with competitive employment." *Id*. at 71. This degree of supervision rose to the level of "job coaching," which Sulken considered a "truly extraordinary accommodation to help a person complete the task." *Id*. at 70–71.

In a written decision, the ALJ denied benefits at the final step of the five-step disability analysis. At step one, she found that Crum had not engaged in substantial gainful activity since January 1, 1993, the initial alleged onset date. At step two, she determined that Crum had two severe impairments: a gastrointestinal disorder and borderline intellectual functioning. At step

three, the ALJ determined that Crum did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Therefore, the ALJ moved to step four, where she determined that Crum retained the capacity "to perform a full range of work at all exertion levels" with a number of limitations:

> He can . . . perform simple, routine tasks (unskilled work). He can have superficial interpersonal contact with coworkers, supervisors and the general public. Work activity cannot include strict time or production demands. He needs to have oral instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting. He can cope with the ordinary and routine changes in a work setting that is not fast paced or of high demand. He needs a break every two hours for 15 minutes at a time.

*Id.* at 23. In arriving at this conclusion, the ALJ stated that she had considered all of Crum's symptoms and the extent to which his symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.

The ALJ also considered opinion evidence. As for Crum's testimony, she found that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Crum's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the ALJ's assessment. *Id.* at 24. Crum's criminal record adversely affected the ALJ's evaluation of his reliability, particularly because burglary and theft "are considered crimes involving dishonesty under the Federal Rules of Evidence." *Id.* at 26. The ALJ also noted that Crum had been "noncompliant with recommended diagnostic testing" for his injuries. *Id.* at 26–27.

The ALJ considered the opinion of Crum's primary-care physician, Dr. Bell. She noted that Dr. Bell had not seen Crum after October 15, 2010, until his next appointment 15 months later on March 2, 2012. The ALJ stated that Dr. Bell's opinion was inconsistent with past

treatment records and thus gave weight to the March 2, 2012 assessment only "as it is consistent with the assessed residual functional capacity in this case." *Id*.

The ALJ also reviewed evidence given by Sulken, the vocational expert. She summarized her questions to Sulken as follows: "whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." *Id*. She summarized Sulken's testimony as: "given all of these factors the individual would be able to perform the requirements of representative medium exertion level and unskilled . . . occupations" including cleaner, dishwasher, and laundry worker. *Id*.

At the final step of the disability analysis, the ALJ concluded that Crum was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id*. at 28. She thus found that Crum was not disabled as defined in §§ 223(d) and 1614(a)(3)(A) of the Social Security Act and denied his application for benefits. The Appeals Council denied review, and the district court accepted the report and recommendation of the magistrate judge and affirmed.

### III.

We give fresh review to the district court's decision. Our review of the Commissioner's decision "is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

### IV.

A person is "disabled" within the meaning of the Social Security Act if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability benefits, a claimant must establish the existence of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than twelve months, and that such impairment(s) render such claimant unable to engage in any substantial gainful activity. *Id.* § 1382c(a)(3)(A), (B).

The Commissioner has established the following inquiry to determine whether a claimant meets this definition. 20 C.F.R. §§ 404.1520(a), 416.920(a). First, "[t]he ALJ asks whether the claimant automatically falls outside the disabled category due to current substantial gainful employment or a lack of a qualifying severe impairment." *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If not, the ALJ flips the inquiry and asks whether the claimant satisfies a listed disability." *Id*. If the claimant suffers from a lesser impairment than those listed, "the ALJ determines the extent of the claimant's limitations and asks whether, given those limitations, jobs exist that the claimant could perform." *Id*. The burden of proof lies with the claimant until the final step of this inquiry, when it falls to the Commissioner to identify "a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

Crum claims that the ALJ committed three errors in denying his application for disability benefits: (1) she did not properly evaluate Crum's claim in accordance with Listing 12.05(C); (2) she did not properly consider the opinion of the State consultative psychological examiner; and (3) she failed to properly analyze the opinion of his treating physician.

**A.  The ALJ's analysis regarding Listing 12.05(C)**

The Social Security Listing of Impairments sets forth "the major body system impairments" that "prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience."  20 C.F.R. § 416.925(a).  It "streamlines the decision process" by allowing claimants with sufficiently severe disabilities to circumvent the rest of the disability analysis.  *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).

Section 12.00 of the disability listing concerns mental disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.  To show an intellectual disability under Listing 12.05(C), a claimant must satisfy the following requirements:  (1) "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22"; (2) "a valid verbal, performance, or full scale IQ of 60 through 70"; and (3) "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  *Id.* § 12.05(C).

Crum contends that the ALJ's determination that he did not meet the requirements of Listing 12.05(C) is not supported by substantial evidence.  The ALJ based the disability listing inquiry, it is true, on a misstatement of Crum's IQ score.  Her decision described three of Crum's intelligence tests administered in 2004, 2009, and 2011, stating that the corresponding full scale IQ scores were 74, 70, and 74 respectively.

In truth, Crum's school records suggest that the 2004 test took place in 1997, when Crum was eight, and that his score was 77 rather than 74.  Any error was harmless, however.  Both the ALJ's misstated score and Crum's actual score are beyond the Listing 12.05(C) range.  Furthermore, irrespective of whether Crum was eight or fifteen, the results of this IQ test were valid for only two years.  20 C.F.R. Pt. 404, Subpt. P, App.1, § 112.00(D)(10).  The ALJ's

failure to include Crum's 2008 IQ test also was harmless because she listed Crum's 2009 full scale IQ score of 70, a qualifying score.

The ALJ ultimately determined that Crum's impairments did not meet or equal a listed disability. She found that Crum has "a digestive system impairment that imposes significant work related limitations," but that he does not satisfy the test that requires both a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." AR 22.

Caselaw supports this decision. In *Forrest v. Commissioner of Social Security*, a claimant appealed an adverse disability decision based in part on the ALJ's failure to explain his findings under Listing 12.05(C). 591 F. App'x 359 (6th Cir. 2014). The claimant contended that this omission precluded judicial review of the ALJ's decision and thus required reversal. *Id*. at 365. We disagreed, finding the error harmless for two reasons. *Id*. at 366. First, reversal was not warranted because the ALJ's conclusion was sufficiently supported by factual findings elsewhere in the decision that need not be repeated and, second, the claimant had not shown that his impairment met or equaled a listed impairment. *Id*.

The ALJ here relied on additional grounds to support her decision that Crum did not suffer from a listed disability. The ALJ considered State consultative psychologist Dr. Leach's characterization of Crum's impairments as "mild restriction[s]" to "moderate difficulties." AR 23. She also noted gaps in medical treatment and medical records indicating that Crum's pain was mild and/or manageable and that he had been released to "return to work activity." *Id*. at 25. Under our standard of review, the record evidence suffices to support the ALJ's conclusion that Crum did not meet the requirements of Listing 12.05(C).

### B.   The opinion of the State consultative psychological examiner

Crum contends that "Dr. Leach's restrictions preclude [him] from performing sustained competitive employment." Appellant's Br. 33. Because the ALJ found that Crum could perform unskilled work with nonexertional limits, Crum reasons, the ALJ must have failed to consider the opinion of Dr. Leach, the State's consultative psychological examiner, in her assessment.

Dr. Leach observed that Crum "would experience difficulty understanding how to perform tasks, and would require supervision and structure to complete job duties accurately." AR 410–11. Based on these needs, Crum would be best suited to "a simple, repetitive job with the assistance of a job coach." *Id*. at 411. When Crum's counsel examined the vocational expert on this point, Sulken testified that an employee's need for more supervision and structure than his co-workers is "not consistent with competitive employment." *Id*. at 71.

Dr. Leach's assessment of Crum's abilities is somewhat at odds with the ALJ's determination that Crum could perform simple, routine tasks with oral instructions and the opportunity to ask questions in a small, solitary work setting. In light of our standard of review and the explanation provided by the ALJ, however, we cannot say that the record reflects a reversible failure to consider Dr. Leach's opinion.

### C.  Application of the treating-physician rule to Crum's primary care provider

When an ALJ considers an individual's claim for disability, she generally must give the opinion of that individual's treating physician "controlling weight." 20 C.F.R. § 404.1527(c)(2). But she must do so only if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id*. If the ALJ does not give the opinion controlling weight, she must consider the following factors to determine what weight to give it: "the length of the treatment

relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). When the ALJ does not give the opinion of a treating physician controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] give[s] [the] treating source's opinion." 20 C.F.R. § 404.1527(c)(2).

The ALJ complied with these requirements, and for that reason the district court correctly upheld the ALJ's decision. Crum's treating physician, Dr. Bell, indicated that Crum would have to miss four to five days of work every month and could stand or walk for two hours in an eight-hour work day. The ALJ followed step by step the factors for determining what weight to give that opinion. *See* 20 C.F.R. § 404.1527(c)(2). At each step she explained her reasons for not giving it controlling weight, both in the paragraph in which she directly discussed Dr. Bell's opinion and elsewhere in her decision.

She first explained that the length, nature, and extent of the treatment relationship between Crum and Dr. Bell was limited. "Dr. Bell noted the claimant was last seen on October 15, 2010 and did not revisit until March 2, 2012." AR 26.

She next explained that Dr. Bell's opinion lacked support. Dr. Bell provided only brief, conclusory statements about Crum's physical limitations, all without explanation, evidence, or reference to any diagnostic techniques. To be well supported, medical opinions must be based upon "medically acceptable clinical and laboratory diagnostic techniques." Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *1 (Soc. Sec. Admin. July 2, 1996). The ALJ explained that Dr. Bell "provided limitations based on one recent examination. . . . At the last examination of

October 2010 the record shows the claimant was noncompliant with recommended diagnostic testing." AR 26. The ALJ permissibly concluded that Dr. Bell's opinion was not well supported.

The ALJ also explained that Dr. Bell's opinion "is not consistent with the past treatment records." AR 26. Dr. Bell's opinion that Crum could not stand for more than two hours a day, and could not work without taking four or five days off every month, was inconsistent with nearly all of the other evidence available to the ALJ. Elsewhere in her decision, the ALJ laid out in detail the treatment records that showed that Crum could return to normal work activity. Among that evidence was a May 21, 2007 medical report that "he could return to full activity," AR 24, a May 23, 2009 exam which showed he was generally in overall good health, a January 4, 2010 physical exam that "was unremarkable," AR 25, an October 15, 2010 physical exam which reported normal bowel functioning, a November 1, 2010 statement by Crum himself that his abdominal pain was not bad and that he could return to work activity, a May 3, 2011 physical exam that was within normal limits, and an October 3, 2011 report by his abdominal surgeon that there were no work restrictions noted.

No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion. *Forrest*, 591 F. App'x at 366.

Crum claims that the ALJ's decision to use Dr. Bell's opinions in hypotheticals during the examination of the vocational expert shows that the ALJ "consider[ed] the validity of Dr. Bell's opinion." Appellant's Br. 35. Considered yes; accepted no. That the ALJ considered the validity of Dr. Bell's opinions, and even used them in hypotheticals with the vocational expert, should not be held against her. To the contrary, it shows the respect that she gave the treating

physician. But use of a treating physician's opinion in a hypothetical by no means establishes that the ALJ accepted the treating physician's opinion, much less gave it controlling weight. Allowing the ALJ to ask questions to reach an informed conclusion should be encouraged, not used against the ALJ on appeal. After she fully considered Dr. Bell's opinion and its implications, she found them to be neither well supported nor consistent with Crum's treatment record. She was therefore obligated to deny them controlling weight. As Social Security Ruling 96-2p explains: "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." 1996 WL 374188, at *2.

The ALJ, it is true, might have explained at even greater length why she did not accord Dr. Bell's opinion controlling weight. But she addressed the factors the regulation required her to consider, and she provided good reasons at each step. That suffices and accordingly the district court's refusal to upset that decision must be affirmed.

The ALJ adhered to the agency-mandated procedural requirements when she denied Crum's application for disability benefits. We therefore **AFFIRM** the judgment of the district court.

**STRANCH, Circuit Judge, dissenting.** On my reading of the record, although the ALJ identified Dr. Bell as Crum's primary care physician, she did not "give good reasons" for the limited weight she afforded Dr. Bell's 2012 opinion. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(2). More than "simply a formality," this procedural requirement of the treating physician rule protects a claimant's ability to understand the disposition of his case and allows for meaningful judicial review of disability determinations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004); *see also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (describing the good reasons requirement as "not simply a formality; it is to safeguard the claimant's procedural rights"). Even when the ALJ's decision is otherwise supported by substantial evidence, failure to observe this "procedural aspect of the treating physician rule" requires reversal. *Wilson*, 378 F.3d at 544.

The most important medical limitation offered by Dr. Bell was the estimate that Crum would miss four to five days of work during a typical month due to his gastrointestinal disorder. The ALJ must have initially found this limitation to be of some import, because she posed it as a hypothetical question to the vocational expert, who was unable to identify any work that would accommodate this limitation. None of the non-examining State medical consultants—whose medical opinions the ALJ apparently weighed more heavily—were asked what effect Crum's impairments might have on his attendance at work.

And yet, the ALJ's decision omitted any mention of Dr. Bell's opinion regarding the attendance limitation or the vocational expert's testimony that no jobs existed to accommodate this limitation. Instead, the ALJ afforded Dr. Bell's opinion only cursory consideration, noting the fifteen-month gap in treatment between October 2010 and March 2012, and that Dr. Bell's assessment was based on one recent examination. The ALJ summarily concluded that Dr. Bell's

"opinion is not consistent with the past treatment records," and gave it weight only "as it is consistent with the assessed residual functional capacity in this case." *Id*.

This circular explanation, that Dr. Bell's opinion is only "credible to the extent it confirmed the ALJ's own conclusion," is not sufficiently specific to satisfy the stringent good reasons requirement. *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 466 (6th Cir. 2012). It leaves this court no basis on which to review the ALJ's treatment of the most important aspect of the primary care physician's medical opinion because the ALJ does not indicate whether it was considered at all, much less how it was weighed in the context of the other record evidence.

Because the ALJ did not adhere to the agency-mandated procedural requirements when she denied Crum's application for disability benefits, I would remand the case to the Social Security Administration for further consideration or additional explanation. Accordingly, I respectfully dissent from the majority's opinion.