Leo KELLY, Jr., Petitioner–Appellant,

v.

Pamela WITHROW, Warden,
Respondent–Appellee.

No. 93–1704.

United States Court of Appeals,
Sixth Circuit.

Argued April 25, 1994.

Decided June 2, 1994.

Rehearing Denied July 8, 1994.

Kenneth M. Mogill (argued and briefed), Mogill, Posner & Cohen, Detroit, MI, Leo E. Kelly, Jr., Alger Maximum Correctional Facility, Munising, MI, for petitioner-appellant,

Kathleen Davison Hunter, Asst. Atty. Gen. (argued and briefed), Office of the Atty. Gen., Habeas Div., Lansing, MI, for respondent-appellee.

Before: GUY and NELSON, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This appeal from denial of a petition for a writ of habeas corpus raises three issues: (1) whether the state prosecutor exercised preemptory challenges during voir dire to exclude black potential jurors solely on account of their race; (2) whether the trial court's denial of the petitioner's motion for a change of venue in the face of extensive media coverage of the crime denied the petitioner his right to a trial by an impartial jury; and (3) whether the trial court violated due process and the petitioner's privilege against compulsory self-incrimination by requiring him to submit to a polygraph test and permitting the psychiatrists who administered the polygraph to testify.

## I.

### A.

The petitioner Leo Kelly was a student at the University of Michigan. On April 17, 1981, Kelly threw a "Molotov cocktail" into the hallway at Bursley Hall, the predominantly freshmen dormitory in which he was living. When students came into the hall from their rooms Kelly began firing at them with a sawed-off shotgun. Edward Siwick, a freshman student, and Douglas McGreaham, a resident advisor, were shot and killed. Both victims were white; Leo Kelly is black.

Kelly was arrested and pled not guilty by reason of insanity. Consequently, the trial judge ordered Kelly to undergo a series of psychological tests, including a polygraph test to determine if Kelly's alleged amnesia regarding the killings was genuine. Kelly "failed" the polygraph test. Although the results of the polygraph test were later ruled inadmissible, the psychiatrists who administered the psychological tests and oversaw the polygraph were allowed to testify at trial. The court did not permit them to testify concerning the results of the polygraph.

Jury selection began on May 17, 1982, and continued for four days. Many jurors were excused for cause and both sides used all

available peremptory challenges. Among those challenged by the prosecution were six black potential jurors, the only African–Americans in the venire. On May 20, after the fifth black juror had been stricken by the prosecution, the defense counsel raised an objection to the allegedly racial challenges. The prosecution responded to the objection, stating that the challenges were not racially motivated, but even if they had been racially motivated, such strikes were permitted. The court held that under existing law, "the right of either side to exercise its peremptory challenge in and of itself ... is unchallengeable. They have an absolute right to exercise those challenges and to give no reason whatsoever." Subsequently, the prosecution struck Bonnie Washington, the sixth and final black juror.

### B.

Kelly was convicted by an all-white jury on June 21, 1982, and sentenced to life in prison. The Michigan Court of Appeals affirmed the jury verdict in 1985. However, before the Michigan Supreme Court ruled on the application for leave to appeal, the United States Supreme Court handed down its decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which the Court found that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race...." 476 U.S. at 89, 106 S.Ct. at 1719. Instead of ruling on the application for leave to appeal, the Michigan Supreme Court vacated the judgment of the court of appeals and remanded the case to that court for review in light of *Batson*. The court of appeals remanded the case to the trial court.

The trial court held a full hearing on July 31, 1987. On September 18, 1987, the trial judge ruled that while Kelly had established a prima facie case of purposeful discrimination, the prosecutors had given acceptable race-neutral explanations that satisfied the *Batson* standard. The Michigan Court of Appeals affirmed the trial court's conclusions and the Michigan Supreme Court denied leave to appeal.

### C.

The district court referred Kelly's habeas corpus petition to a magistrate judge who filed a lengthy report in which he recommended that the petition be denied. Kelly's attorney filed objections to the report and recommendation. Instead of setting forth specific objections, however, he referred to his earlier briefs in support of the petition and stated, "In the interests of brevity and avoidance of repetition, each of these pleadings is incorporated by reference herein."

The district court approved and adopted the recommendation of the magistrate judge, 822 F.Supp. 416. In the judgment dismissing the case District Judge Benjamin F. Gibson wrote that he had "given new consideration and made a *de novo* determination of those portions to which specific objection has been made."

### II.

Before reaching the substantive issues raised by the petitioner, we must deal with the respondent's assertion that Kelly waived the right to appeal by failing to file "specific objections" to the magistrate judge's report and recommendations.

### A.

Exercising its supervisory power over the district courts, this court held in *United States v. Walters*, 638 F.2d 947, 949–50 (1981), that a party must file timely objections to a magistrate's report with the district court in order to preserve the right to appeal. The purpose of such objections is to provide the district court "with the opportunity to consider the specific contentions of the parties and to correct any errors immediately." *Id.* at 950. The Supreme Court upheld this rule in *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), a habeas corpus case. The Court stated that "[t]he filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Id.* at 147, 106 S.Ct. at 471 (footnote omitted).

In *Smith v. Detroit Federation of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th

Cir.1987), we stated that "only those specific objections to the magistrate's report made to the district court will be preserved for appellate review; making some objections but failing to raise others will not preserve all the objections a party may have."

The only case we have found in which a party attempted to incorporate previous filings by reference in objections to a magistrate's report and recommendations provides little help. In *Howard v. Secretary of Health and Human Services*, 932 F.2d 505 (6th Cir.1991), the party who lost before the magistrate filed a document in which she specifically objected to the magistrate's determination to deny her request for relief and stated that she "supported" her objections by relying on her earlier brief in support of her motion for summary judgment. The record disclosed, however, that the party had previously filed neither a summary judgment motion nor a brief. In holding that the party had waived appellate review we wrote:

> A general objection to the entirety of the magistrate's report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the magistrate useless. The functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. The duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act.

*Id.* at 509.

## B.

▇▇▇ The requirement for specific objections to a magistrate judge's report is not jurisdictional and a failure to comply may be excused in the interest of justice. *Kent v. Johnson*, 821 F.2d 1220, 1222–23 (6th Cir. 1987). In the present case, unlike in *Howard*, the objections directed the district judge's attention to specific issues decided by the magistrate contrary to Kelly's position. The district judge apparently had no problem in focusing on the specific areas of disagreement between the parties. Thus, the objec-

tions served the purposes of the requirement that objections be specific.

We do not pronounce a general rule that every attempt to incorporate other documents by reference in lieu of spelling out specific objections to a magistrate's report will suffice. The circumstances of this case—in particular, the district judge's acknowledgment that he was able to understand and review the specific determinations of the magistrate objected to by the petitioner—lead us to conclude that we should consider the merits of this appeal. We caution the attorneys of the circuit that a concise statement of specific holdings of the magistrate judge to which exception is taken is the preferred and safer course.

## III.

Although Kelly made out a prima facie case of intentional discrimination by showing that the prosecutor exercised peremptory challenges to remove all African–Americans called as jurors in his case, the state trial judge, after a hearing, ruled that the prosecutor had given satisfactory non-discriminatory reasons for each peremptory strike. The prosecutor may not rely on a general assertion that the peremptories were exercised without racial motivation, but "must articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724 (footnote omitted).

## A.

▇▇▇ Both prosecutors involved in selection of the jury that tried Kelly filed detailed affidavits in which they gave reasons unrelated to the race of the prospective jurors for each of the strikes that excluded a black venireperson from the jury. Two of the excluded prospective jurors had been members of an earlier jury that had acquitted a defendant in a case the prosecutors felt was very strong for a conviction. Two others appeared to the prosecutors to be too eager to serve on this particular jury. One of these had a daughter who had friends at the University, while the other one said she had never read or heard anything about the insanity defense. This woman was a librarian,

and the trial took place during a time when the media carried many stories about the insanity defense relied upon by John Hinckley who had attempted to assassinate President Reagan. The prosecutors just did not believe this prospective juror had answered some of their questions truthfully. The remaining two excluded black venire members were a man whose own son had had trouble in school and might be sympathetic to Kelly and a woman whose responses to questions about the insanity defense led the prosecutors to feel she would be unfavorable to them on that issue.

One of Kelly's attorneys filed an affidavit in connection with a motion for a new trial in which he took issue with many of the statements of reasons contained in the prosecutors' affidavits. The principal thrust of this affidavit was to question the bases assigned by the prosecutors for their impressions that the stricken jurors would have been unfavorable to the State. The State also filed additional affidavits of the trial court prosecutors containing responses to the defense attorney's affidavit.

The trial judge found that the neutral and non-discriminatory explanations given by the prosecutors for each of the six excluded jurors shifted the burden of establishing purposeful discrimination back to Kelly. After pointing out that an attorney's appraisal of the attitudes and likely leanings of a prospective juror are based on a multitude of factors that are evaluated in light of the attorney's own courtroom experiences, the court found that Kelly had failed to establish by a preponderance of the evidence that the exclusion of the six prospective jurors, or any of them, was based solely on their race.

### B.

The state trial judge followed the sequential steps prescribed in *Batson* in reaching his determination that there was no equal protection violation in this case. See *Batson*, 476 U.S. at 96–98, 106 S.Ct. at 1722–24 (first, the defendant must make a prima facie case; next, the burden shifts to the prosecutor to articulate a race-neutral explanation for his peremptory challenges; and, finally, the trial court must determine whether the defendant

has carried his burden of proving purposeful or intentional discrimination).

The Supreme Court stated in *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991), that in assessing the race-neutrality of the prosecutor's explanation, the issue is the "facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." The trial court's decision on the ultimate question of discriminatory intent represents a finding of fact that is entitled to "great deference on appeal." *Id.* at 364, 111 S.Ct. at 1868. According deference to such a determination makes particular sense in a case where discriminatory intent is the issue, according to the Court, because the ultimate finding "largely will turn on evaluation of credibility.'" *Id.* at 365, 111 S.Ct. at 1869 (quoting *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21). Furthermore, in habeas corpus actions, 28 U.S.C. § 2254(d) commands federal courts to accord a presumption of correctness to state court factual findings.

After carefully considering the record of the voir dire together with the affidavits of the attorneys for Kelly and the State, we find no basis for disturbing the trial court's determination that there was no *Batson* violation. This finding has been upheld by the Michigan appellate courts and by the experienced and capable district judge who considered this habeas corpus case.

### IV.

Kelly requested a change of venue prior to trial, based on extensive media coverage of the crime and subsequent developments. The trial court denied the motion after considering Kelly's arguments and exhibits in support. The district court adopted the magistrate judge's findings and conclusions that denial of a change of venue did not deprive Kelly of a fair trial.

### A.

There was a great deal of media coverage surrounding this case. In particular, Kelly points to multiple newspaper articles in

which the story of the murder is recounted, making specific mention of the race of the victims (white) and the race of the defendant and his attorney (black). Kelly notes that there were a number of stories about the victims, giving detailed descriptions of their accomplishments and the grief of the families. Most importantly, there were several stories detailing the fact that Kelly underwent a lie detector test which showed that he was lying when he said that he could not remember the events surrounding the murders.

In addition, the media consistently linked this case with the subsequent attempted assassination of President Reagan by John Hinckley, since both defendants were using the insanity defense.

Kelly contends that the impact of these stories was evident, because during voir dire most of the potential jurors admitted that they had heard details of the case and several had already formed opinions based on that coverage.

The case did receive extensive media coverage, but, as the respondent points out, the trial judge took particular pains in dealing with pretrial publicity during voir dire. The trial judge asked each prospective juror about his or her acquaintance with the case. Further questions were posed to those who felt they knew some of the facts. Before permitting any person who had formed an opinion about the case, however tentative, to remain eligible to serve on the jury, the trial judge exacted an assurance that the person could set his or her opinion aside and decide the case based solely on the evidence and jury instructions. The court excused for cause those who could not give this assurance. A total of forty-four prospective jurors were excused for cause, and each side used all of its peremptory challenges: fifteen by the prosecution and twenty by the defense.

The trial court also addressed the question of juror knowledge about the John Hinckley trial and related media discussion of the insanity defense. Any prospective jurors who had preconceived ideas about the legitimacy or illegitimacy of that defense, which they were unable to lay aside, were excused for cause.

## B.

■ Due process does not require that a jury be totally ignorant of the case. As the Supreme Court stated in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption or a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 722–23, 81 S.Ct. at 1642–43. This court held in *United States v. Blanton*, 719 F.2d 815, 830 (6th Cir.1983), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984), that it is sufficient if a juror who has formed an impression as to guilt or innocence on the basis of pretrial publicity can lay that impression aside and render a verdict based solely on the evidence heard in court. The *Blanton* court held that a trial court's finding that a defendant has failed to demonstrate juror bias or prejudice after extensive questioning concerning the impact of publicity and many excusals for cause based on even hints of possible prejudice is entitled to deference. *Id.* at 824.

## C.

■ We believe the trial court moved correctly and vigorously to cure the publicity problem, thus minimizing any potential prejudice. Furthermore, Kelly has failed to demonstrate any actual prejudice flowing from this publicity. As this court noted in *Blanton*, 719 F.2d at 832, any party who claims to have suffered injustice must sustain that claim " 'not as a matter of speculation but as a demonstrable reality.' " (quoting

*United States ex rel. Darcy v. Handy,* 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (1956)). "The fact that petitioner did not challenge for cause any of the jurors selected is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt." *Id.*

While there may be some cases in which the Court has held that a trial was "utterly corrupted by press coverage," thus not requiring any showing of actual prejudice, the circumstances in this case do not rise to the level necessary to create the "carnival atmosphere" described in those cases. See, *e.g., Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

The Michigan Court of Appeals found that the trial court had taken "extraordinary care" in voir dire concerning pretrial publicity and that the trial court's denial of change of venue did not constitute an abuse of discretion. "[T]he state court's holding on juror impartiality is subject to the statutory presumption of correctness" under 28 U.S.C. § 2254(d). *Aldridge v. Marshall,* 765 F.2d 63, 67 (6th Cir.1985), *cert. denied,* 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986). Kelly has pointed to nothing in the record that would require this court to reverse that state court finding.

### V.

The last issue is related to the polygraph examination and the psychiatrists' testimony respecting the petitioner's insanity defense.

### A.

After Kelly gave the notice required by Michigan law of his intent to plead insanity, the court instructed Kelly to undergo a series of psychiatric tests, including a polygraph test using sodium brevitol. Although Kelly objected to these tests, he submitted to them in order to pursue his insanity plea. The tests indicated that Kelly was lying when he stated that he did not remember the events surrounding the murders.

Kelly states that only *after* he "failed" the tests did the examining psychiatrists voice their belief that he was feigning mental illness. After the trial court held that the results of the polygraph were not admissible under Michigan law, Kelly also moved to have the testimony of these doctors who supervised the test excluded, but the motion was denied. However, the court did instruct the doctors to testify only as to their opinions *prior* to the polygraph examination. The doctors testified that Kelly was not mentally ill; Kelly contends that this testimony was unavoidably tainted by the inadmissible tests.

According to Kelly, this compulsory polygraph test violated his right against self-incrimination. Furthermore, Kelly argues that he could not effectively cross-examine the psychiatric experts because their opinions could not be completely disassociated from the polygraph results. Consequently, he claims a violation of his right to cross-examination under the Sixth and Fourteenth Amendments as well.

### B.

▮ " '[A] defendant's right not to incriminate himself is not violated *per se* by requiring him, in an appropriate case, to submit to a mental examination.' " *People v. Martin,* 386 Mich. 407, 427, 192 N.W.2d 215 (1971), *cert. denied,* 408 U.S. 929, 92 S.Ct. 2505, 33 L.Ed.2d 342 (1972) (quoting *United States v. Albright,* 388 F.2d 719, 723 (4th Cir.1968)). See also *Granviel v. Lynaugh,* 881 F.2d 185, 190 (5th Cir.1989) ("Raising an insanity defense constitutes a waiver of the defendant's protection against self-incrimination with regard to psychiatric testimony."), *cert. denied,* 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990) (citing *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987)). Having relied upon an insanity defense, Kelly was required to comply with the court order that he be examined by psychiatrists. Because the doctors determined that a complete examination and report required a polygraph exam, the fact that Kelly was required to submit to that exam was not sufficient, standing alone, to constitute error. Only if the trial court had permitted the jury to learn, directly or indirect-

ly, of the results of the test would there have been error. Because Kelly waived his Fifth Amendment right with respect to his insanity defense, any error in the admission of polygraph results would have been at most the basis for a new trial under Michigan law, not a constitutional violation. Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial. *Logan v. Marshall,* 680 F.2d 1121, 1123 (6th Cir.1982).

The trial court did not admit the results of the polygraph test and did not permit the State's medical witnesses to testify concerning the test or to give any opinion based on the results. Kelly's counsel cross-examined these witnesses extensively and argued to the jury that they had not examined Kelly correctly and were biased in favor of the State. The defense had an adequate opportunity to expose any bias on the part of the examining psychiatrists and any deficiencies in their procedures. Therefore, the trial court did not commit error that produced a fundamentally unfair trial by admitting this psychiatric evidence.

## CONCLUSION

The record in this case reveals the trial of a difficult case presided over by an extremely careful and knowledgeable state court judge. We find no constitutional error.

The judgment of the district court is **AFFIRMED**.