NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0259n.06

No. 23-3825

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 12, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| JASON SALLAZ, | ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| Defendant-Appellee. | ) ) | OPINION |
|  | ) | |

Before: GIBBONS, WHITE, and MURPHY, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Jason Sallaz appeals the district court's order affirming the denial of his application for Social Security disability insurance benefits. He argues that the administrative law judge (ALJ) erred in finding unpersuasive two medical opinions concluding that his physical impairments prevented him from performing sedentary work. We **AFFIRM**.

**I.**

**A.**

Sallaz has a history of leg and back pain stemming from a 2003 car accident in which he fractured his right femur and a 2017 tree-cutting accident in which he fractured his left. The 2003 fracture resulted in a surgical rod being inserted in his right leg. After the injury, he worked from 2004 to 2017 as a machine helper for die-casting companies, a semi-skilled heavy exertional position that sometimes required him to lift up to 150 pounds. Beginning in 2014, he reported leg and back pain to his primary-care physician, who prescribed the pain medication Ultram. After the

2017 accident, Sallaz had another rod inserted, this time in his left leg. He stopped working after the accident and lost his health insurance about one month later.

In 2019, Sallaz regained insurance and resumed seeking treatment from his primary-care physician, Dr. Daniel Miller. He told Dr. Miller that "his knees [were] shot" and that he was "in the process of applying for disability." R.7, PID 338. On March 13, 2019, Dr. Miller gave Sallaz "two injections of kenalog with lidocaine" for his leg pain. *Id.* Sallaz returned to Dr. Miller on May 28, 2019, and reported that he was concerned that the surgical screws in his left leg were loose and that "it hurts when he walks all the time." *Id.*, PID 336.

Dr. Miller referred Sallaz to an orthopedist, Dr. John Stefancin. During his first examination by Dr. Stefancin, on May 30, 2019, Sallaz told Dr. Stefancin he had pain in both knees, and that the pain in his left knee was worse. Dr. Stefancin noted that Sallaz was "[p]ositive for joint pain/stiffness or swelling," muscle pain and weakness, "numbness or tingling sensations," and discomfort. *Id.*, PID 384. After examining Sallaz, he also observed that Sallaz's knees had "[g]ood patellar mobility" but "positive effusions" (swelling)[1] and "[p]ositive tenderness to palpation" over the screwheads in his left leg, but not the right. *Id.* He also found that Sallaz had no muscle atrophy and "5/5 strength" in his hips, legs, and feet. *Id.* However, he observed that Sallaz walked with an "[a]ntalgic gait."[2] *Id.* Dr. Stefancin's assessment was that Sallaz had "[b]ilateral knee medial meniscus tears with bilateral retrograde rods; left knee loose body and symptomatic distal femoral screw hardware." *Id.*, PID 383. He recommended Sallaz get MRIs of

---

[1] *Joint Effusion (Swollen Joint)*, Cleveland Clinic, https://my.clevelandclinic.org/health/symptoms/21908-joint-effusion (last updated Oct. 12, 2021).

[2] An antalgic gait is a limp caused by pain. *Gait Disorders and Abnormalities*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/21092-gait-disorders (last updated Feb. 22, 2023); *see also Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x 544, 549 n.6 (6th Cir. 2006) ("An antalgic gait is a limp in which a phase of the gait is shortened on the injured side to alleviate the pain experienced when bearing weight on that side.").

2

both knees and advised that "arthroscopic loose body removal" on Sallaz's left knee and a medial meniscus evaluation might be needed. *Id.* Sallaz also told Dr. Stefancin he was "contemplating having the hardware removed" from his thigh. *Id.*

Sallaz saw Dr. Stefancin again on July 11, 2019 to review the results of the MRIs. Dr. Stefancin made observations similar to those in his first examination of Sallaz, finding no muscle atrophy, full strength in his lower extremities, "small effusion," "good patellar mobility," and tenderness in Sallaz's left leg over the screws. *Id.*, PID 382. He also noted that Sallaz's "[l]ight touch sensation [was] intact," and that Sallaz had a "[s]lightly antalgic gait." *Id.* After reviewing the MRIs, he noted "no meniscal tear or ligamentous injury" in Sallaz's left knee, "mild scarring" in the fatty tissue of both knees, an "ossified body" in the left knee, and "mild medial meniscus intrasubstance degeneration without tear" in the right knee. *Id.* Sallaz told Dr. Stefancin he "want[ed] to consider" removing the screws from his leg, but was unsure of the timing. *Id.*

On August 2, 2019, Sallaz visited Dr. Miller to follow up on his leg pain. Dr. Miller noted that Sallaz's right leg had a "slightly decreased" range of motion, and administered a kenalog injection in his left knee "without complication." *Id.*, PID 426. Sallaz returned to Dr. Miller on June 4, 2020 for additional knee injections and reported that "his chronic back pain ha[d] been worse," he was "having lower back weakness and pain radiating to both legs," and "his legs [were] numb at times." *Id.*, PID 428. Dr. Miller again observed a slightly decreased range of motion in Sallaz's right leg, and also muscle spasms in Sallaz's back. He further noted: "Straight leg lift positive on the left. Motor is 5/5 proximally and distally of bilateral lower extremities. Sensory is grossly intact to light touch bilaterally. Reflexes 2+ and symmetrical of bilateral knees and 1+ symmetrical of bilateral [A]chilles." *Id.* He noted that Sallaz's gait was within normal limits. For Sallaz's leg pain, he again administered injections "in both knees without complication." *Id.*, PID

429. But he noted that Sallaz's back pain was "chronic and progressive," had "[f]ailed conservative therapy," and required further MRI evaluation. *Id.*

Sallaz had an MRI on August 27, 2020, and a follow-up appointment with Dr. Miller on September 11, 2020 to review the results. The radiologist's summary interpretation of the MRI showed degenerative disc disease, a small "paracentral annular fissure and disc protrusion . . . minimally contacting the right L5 nerve root," "[n]o spinal stenosis nor significant neural foraminal narrowing," and an "area of abnormal bone marrow signal intensity." *Id.*, PID 444–45. During Dr. Miller's examination of Sallaz, he recorded the same observations of his gait, motor function, and reflexes that he had during the August 2 visit. He recommended Sallaz make another appointment with an orthopedist for his leg pain. He described the MRI as "question[ing] abnormal bone lesion in T10 [vertebra]" and showing a herniated disc. *Id.*, PID 448. He concluded that Sallaz's back pain would require further assessment, specifically a bone scan and "evaluation for possible epidurals." *Id.*

In summary, from 2019 to 2020, Sallaz complained of leg and back pain to his doctors; their examinations identified impairments in his knees and spine, but they also consistently observed that he retained function—strength, sensation, some range of motion, etc.—in his lower extremities.

**B.**

Sallaz applied for Social Security disability insurance benefits on July 18, 2019, listing his disabling limitations as: leg fractures, back pain and numbness "[due] to shorter leg," depression, anxiety, learning difficulties, sleeplessness, and thyroid cancer. *Id.*, PID 249.

A state-agency medical consultant, Dr. Diane Manos, reviewed Sallaz's medical records to assess his physical residual functional capacity (RFC) on August 26, 2019. She determined that Sallaz did have exertional limitations. But she concluded that, despite these limitations, he remained able to: lift or carry up to ten pounds frequently and twenty pounds occasionally; otherwise push or pull without limitation; stand or walk with normal breaks for a total of four hours; sit with normal breaks for a total of six hours out of an eight-hour workday; climb, crouch, crawl, or kneel occasionally; stoop frequently; and balance without limitation.

Sallaz's claim was denied initially and on reconsideration.[3] He then requested a hearing before an ALJ, which was held on October 15, 2020. At the hearing, Sallaz testified that his leg and back pain worsened considerably after his 2017 injury, and that his pain level was "about an eight [out of ten] all day long." *Id.*, PID 86. He testified that he could only walk for about ten minutes before needing to take a break and sit down, and only sit for half an hour before his legs went numb. He said he could lift maybe twenty or thirty pounds. He further testified that he could perform everyday tasks like cooking and cleaning if he took frequent breaks, but needed assistance from family or friends to shop for groceries or mow the lawn.

Sallaz testified he treated his pain using conservative means. He explained he was planning to pursue more aggressive pain management in the future, but at present was only taking over-the-counter pain medications like Tylenol. By way of explanation, he said it was "kind of hard to get pain medicine nowadays." *Id.*, PID 86. And, he testified that he wore ineffective quarter-inch lifts to correct the pain caused by the one-inch difference between his right and left leg. He told the ALJ that he had not looked into full one-inch lifts because he was unsure that his insurance would

---

[3] Dr. Manos's residual functional capacity conclusions were affirmed at the reconsideration stage by another state-agency medical consultant, Dr. Rebecca Neiger.

cover them. Finally, he testified that he did not use a cane when walking, despite probably needing one, out of embarrassment.

A vocational expert testified during the hearing that an individual with the limitations described in Dr. Manos's assessment could not perform Sallaz's previous job. But, he testified, a person with those restrictions who was further limited to sedentary work could perform "a very limited range of sedentary, unskilled work." *Id.*, PID 103. He identified 21,000 jobs in the national economy fitting that description, in the occupations of cutter-paster, addresser, and inspector-tester-sorter.

After the hearing, Dr. Miller referred Sallaz to a physical-therapy practice for a functional capacity evaluation (FCE) assessing his ability to perform work-related tasks. Dr. Michelle Godek performed the FCE on November 2, 2020, and concluded that Sallaz had more significant limitations than the state-agency medical consultant found. Specifically, she concluded Sallaz could: sit for four to five hours total in a workday, for sixty minutes at a time; stand for less than an hour total, in five-minute increments; walk for one to two hours total, but only over "occasional short distances"; occasionally balance, squat, and use his feet and hands; minimally bend, stop, climb stairs, or crouch; and never crawl or kneel. *Id.*, PID 455. In a November 17, 2020 letter, Dr. Miller agreed with and adopted the FCE's conclusions.

The ALJ issued a decision on January 13, 2021, concluding that Sallaz was not disabled within the meaning of the Social Security Act. The ALJ arrived at this conclusion after engaging in the required "five-step sequential evaluation process." 20 C.F.R. § 404.1520(a)(4). At the second step of that analysis, she determined Sallaz had severe medical impairments: the left and right femur fractures and related knee problems, degenerative disc disease, depressive disorder,

and borderline intellectual functioning.[4] At the fourth step, the ALJ assessed Sallaz's RFC—"the most [a claimant] can still do despite [his or her] limitations" based on all relevant record evidence. 20 C.F.R. § 404.1545(a)(1); *see id.* § 404.1520(a)(4)(iv). She concluded that he was able "to perform sedentary work," but with more significant limitations than those in Dr. Manos's assessment. R.7, PID 49. She further concluded that Sallaz could not perform his past relevant work due to these limitations. However, at the fifth step, the ALJ determined that Sallaz was not disabled under the Social Security Act because these limitations did not prevent him from "making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.*, PID 63.

In reaching this conclusion, the ALJ found that Sallaz's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.*, PID 50–51. She further found that the state-agency medical consultants' assessments carried "some persuasiveness," but found their recommendations that Sallaz retained the ability to perform non-sedentary light work "not persuasive." *Id.*, PID 58. She also found that the conclusions in Dr. Godek's FCE and Dr. Miller's adoption of those conclusions were not persuasive.

The Social Security Administration's Appeals Council denied Sallaz's request for review of the ALJ's decision, and Sallaz sought review in the district court. The district court referred the matter to a magistrate judge, who recommended affirming the ALJ's decision. The district court rejected Sallaz's objections to the magistrate judge's report and recommendation and affirmed. Sallaz appeals.

---

[4] Sallaz's appeal concerns only the ALJ's conclusions regarding his physical impairments.

**II.**

"We exercise de novo review of district-court decisions in Social Security cases," *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020), meaning that, like the district court's, our "review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "The substantial-evidence standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). An ALJ decision supported by substantial evidence must therefore be affirmed "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997); *see DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) ("The 'substantial evidence' standard . . . does not permit the court to resolve conflicts in evidence.").

**III.**

Sallaz challenges the ALJ's decision on three grounds. First, he argues that the FCE constitutes objective medical evidence, and the ALJ therefore was not free to discount its conclusions. Second, he argues that even if the FCE, or some portion of it, instead constitutes medical opinion, the ALJ improperly found it unpersuasive. Third, he argues that the ALJ improperly found Dr. Miller's opinion adopting the FCE's conclusions unpersuasive.

**A.**

Sallaz first argues that the FCE was objective medical evidence, and the ALJ therefore improperly exceeded her role by rejecting its conclusions. We disagree; under Social Security regulations, the FCE's conclusions are medical opinion.

The FCE had two components—its conclusions regarding Sallaz's work limitations, and the underlying test results and observations forming the basis for those conclusions. Those underlying results fit the regulations' definition of objective medical evidence, which includes "medical signs," *i.e.*, "anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements" that are "shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. §§ 404.1502(g), 404.1513(a)(1). But the FCE's conclusions fit squarely within the definition of "medical opinion[s]," which are "statement[s] from a medical source about what [the claimant] can still do despite [his] impairment(s)" and includes, for example, impairment-related restrictions on sitting, standing, walking, and lifting. *Id.* § 404.1513(a)(2)(i).

Moreover, the Sixth Circuit Social Security case Sallaz himself relies on repeatedly characterized FCE conclusions as medical opinion. *See Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 554 (6th Cir. 2020) ("[T]he FCE's *opinion* that Hargett's ability to stand or walk does not meet any standard for work activity is not 'patently deficient,' because it is *based on* objective observation and defined criteria." (emphasis added)); *id.* at 552–53 ("[W]e turn to the question of whether Dr. Lucardie's signature on the FCE, which was completed by a physical therapist, makes the FCE *a treating-source opinion* for purposes of evaluating Hargett's disability claim." (emphasis added)); *see also Adams v. Comm'r of Soc. Sec.*, 2023 WL 6366106, at *3 (6th Cir. Sept. 28, 2023) ("The ALJ was not required to accept the FCE's findings merely because of its alleged objectivity."). So, Sallaz's citations to cases suggesting FCEs may be objective medical evidence in ERISA cases notwithstanding, *see, e.g.*, *Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015), in the Social Security context, their conclusions are medical opinions.

**B.**

The question then is whether the ALJ properly evaluated the FCE's conclusions within the framework for medical opinions. An ALJ is not to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). But the ALJ must articulate how "persuasive" she finds "all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* § 404.1520c(b).

In evaluating the persuasiveness of a medical opinion, an ALJ is directed to consider several factors: the opinion's supportability and consistency; the treating source's relationship with the claimant and specialization; and other factors, such as the medical source's familiarity with other evidence relevant to the claim. *Id.* § 404.1520c(c). Supportability and consistency are "the most important factors," and the ALJ must explain her consideration of them; the ALJ may, but is not required to, explain how she considered the other factors. *Id.* § 404.1520c(b)(2). Supportability evaluates how well "the objective medical evidence and supporting explanations presented by a medical source" support a medical opinion. *Id.* § 404.1520c(c)(1). Consistency evaluates whether the medical opinion is consistent "with the evidence from other medical sources and nonmedical sources." *Id.* § 404.1520c(c)(2).

**1.**

Sallaz argues that the ALJ performed this analysis incorrectly in four portions of her decision. First, the ALJ rejected the FCE's limitations on Sallaz's use of his upper extremities as "completely unsupported" and not "correlat[ing] to the nature and location" of Sallaz's claimed impairments, which concerned his legs and back. R.7, PID 58. Second, the ALJ noted that many of the limitations were based primarily on Sallaz's "[s]ubjective reports of pain." *Id.*, PID 59. For

example, Dr. Godek concluded that Sallaz was limited to lifting 12.6 pounds from a 30 to 60-inch height because, after four repetitions using that weight, Sallaz told her he felt "[p]inching in the back" and was "afraid it's going to break because it is half gone." *Id.*, PID 457. The ALJ found this subjective basis "less persuasive," because Sallaz relied on the conservative pain-management treatment of over-the-counter pain relievers and periodic knee injections. *Id.*, PID 59. Third, the ALJ questioned whether the FCE's conclusion that Sallaz could sit for no longer than sixty minutes at a time constituted a "frank limitation in continuous sitting ability." *Id.* Dr. Godek explained that this limitation was based on Sallaz sitting for that duration during the evaluation "during keyboard and history review activity" and while filling out paperwork. *Id.*, PID 459. The ALJ noted that the FCE itself lasted only two-and-a-half hours and required Sallaz to frequently perform tasks on his feet. Finally, the ALJ found that Dr. Godek's observation that Sallaz walked with an antalgic gait during the FCE was "not consistent" with Dr. Miller's observation of a normal gait and Dr. Stefancin's observations of a "slightly" antalgic gait. *Id.*, PID 59.

Sallaz argues that in making these determinations, the ALJ overstepped her role by attempting to "play[] doctor" and invalidate the FCE's results. Appellant Br. at 16. We disagree. In none of these determinations did the ALJ attempt to make an independent medical judgment. Rather, as required by the Social Security regulations, these conclusions were assessments of the consistency of the FCE's limitations with other record evidence and their supportability based on the underlying results and accompanying explanation.

Sallaz also argues that the ALJ could not discount the FCE's conclusions without "a clear opinion from another medical source regarding the [FCE's] results." *Id.* at 17. But the cases he cites in support of this contention did not consider or discuss such a requirement. *See Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 462–63 (6th Cir. 2012); *Simpson v. Comm'r of Soc. Sec.*,

11

344 F. App'x 181, 194 (6th Cir. 2009).[5]  Again, the Social Security regulations require ALJs to evaluate the persuasiveness of submitted medical opinions, with particular focus on their supportability and consistency.  Sallaz identifies no authority limiting ALJs to relying on a rebuttal medical opinion when doing so.

**2.**

Sallaz next argues that, even if the ALJ's evaluation of the FCE within the persuasiveness framework was proper, her conclusions regarding the supportability and consistency of the FCE's limitations were not supported by substantial evidence.  He first takes issue with the ALJ's statements that the FCE did not offer an explanation or observation supporting its upper-extremity limitations, that those limitations did not correlate to his complaints of leg and back pain, and that many of the FCE limitations were based on Sallaz's subjective reports of pain.  Sallaz argues that the section of the FCE summarizing its "testing and observations" did "provide[] detailed testing modules and results" supporting the limitations.  Appellant Br. at 19.  Additionally, the ALJ discounted the FCE's limitations on kneeling and crawling as unsupported because Dr. Godek noted Sallaz did not perform those activities during the test.  Sallaz argues that, given the other posture and tolerance observations noted in the FCE, it should have been "obvious" to the ALJ why those actions did not need to be performed.[6]  *Id.* at 20.

---

[5] Nor did the ALJ's actions here resemble those found impermissible in those cases.  In *Simpson*, the court held that the ALJ impermissibly substituted his own medical judgment for the treating physician's by "determining the degree of pain resulting from [claimant's] condition."  344 F. App'x at 194.  And in *Dragon*, the ALJ discounted the claimant's low score on an I.Q. test based on the fact she had graduated high school and was a mother.  470 F. App'x at 462–63.  The court, however, concluded that those activities were not, in fact, "inconsistent with her tested I.Q. scores."  *Id.* at 463.

[6] Sallaz is presumably referencing the explanation offered by Dr. Godek in a letter submitted after the ALJ's decision, stating that she could accurately assess Sallaz's ability to kneel and crawl because "[t]he posture needed to get into the kneel and crawl positions [was] also demonstrated in other activities throughout the Assessment."  R.7, PID 222.  Further, she said she declined to have him perform those actions because, in her professional judgment and given his medical history, the resulting pain would have interfered with later results in the assessment.

The ALJ's conclusion that the FCE offered limited support or explanation for these conclusions was reasonable. Regarding the upper-extremity limitations, the "testing and observations" section of the FCE did describe the effect on Sallaz's back and legs while performing certain tasks—such as reports of pain, abnormal gait, or wobbling legs. It did not describe any similar effect, limitation, or pain in his upper body. The only apparent basis for the upper-body limitations appears to be the results of grip and resistance dynameter tests, which are presented without any analysis or interpretation. And the ALJ correctly noted that in the "testing and observations" section, the observations accompanying many limitations—for example, lifting, pushing and pulling, and balance—were largely or entirely Sallaz's subjective reports of pain. Finally, as the FCE's only explicit discussion of kneeling and crawling was to note that Sallaz did not perform either, the ALJ was reasonable in declining to infer from tests of other activities (for instance, lifting or squatting) that he would be unable to kneel or crawl.[7]

Sallaz also argues that the ALJ's conclusions about the FCE limitations' consistency were not supported by substantial evidence. The ALJ determined that the FCE limitations were not persuasive, in part, because they conflicted with Dr. Miller's observations, made during June and September 2020 examinations, that Sallaz had a normal gait. Sallaz argues that Dr. Miller's observations were weak evidence of inconsistency because Dr. Miller's examinations (a) occurred several months before the FCE, and (b) Dr. Miller observed other leg issues—decreased range of motion in one leg and positive "[s]traight leg raise" in the other—indicating physical limitations. R.7, PID 428, 447. He further argues that the ALJ failed to discuss the other lower-extremity

---

[7] Sallaz further contends, without elaboration, that "the ALJ failed to appropriately cite the record when discounting the supporting evidence." Appellant Br. at 20. That is not borne out by the ALJ's decision—she consistently cited and discussed specific portions of the FCE and other medical evidence.

13

problems documented in Dr. Miller's notes after 2017, and Dr. Stefancin's observation that Sallaz had an "antalgic" or "[s]lightly antalgic" gait.

The observations of Sallaz's gait varied between the FCE (antalgic), Dr. Miller's examinations (normal), and Dr. Stefancin's examinations (antalgic or slightly antalgic). The ALJ's conclusion that the FCE's one-hour walking limitation was inconsistent with his sometimes normal or only "slightly" antalgic gait was a reasonable one. And weighing conflicting evidence was properly within the ALJ's role. *Biesteck v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017) (citing *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)). At bottom, Sallaz's argument is that the ALJ should have resolved the conflicting evidence of his gait abnormalities the other way. But because substantial evidence supported the ALJ's finding, we must accept it. *Key*, 109 F.3d at 273.

In sum, the ALJ did not err in finding the FCE conclusions unpersuasive.

## C.

Finally, Sallaz argues that the ALJ erred in finding Dr. Miller's opinion unpersuasive. As an initial matter, we must first determine whether the district court correctly found Sallaz waived this issue by failing to properly raise it in his objections to the magistrate judge's report and recommendation.

## 1.

Sallaz did enough to raise and preserve his objection, albeit just barely. Sallaz specifically objected to the magistrate judge's conclusion that the ALJ did not err in discounting Dr. Miller's opinion. However, rather than spell out the arguments supporting this objection, Sallaz instead referred to the arguments in his initial brief to the magistrate judge, "[t]o avoid being repetitive." R.13, PID 542. A general objection to a report and recommendation is insufficient to preserve an

issue for appeal; instead, a party must "explain and cite specific portions of the report" the party objects to. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) (alterations in original omitted). "This court has allowed parties to incorporate prior arguments into their objections to a magistrate judge's report, but we disfavor such practices." *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). We have cautioned that, instead, "the preferred and safer course" is to provide "a concise statement of specific holdings of the magistrate judge to which exception is taken." *Kelly v. Withrow*, 25 F.3d 363, 366 (6th Cir. 1994).

Under this approach, although it is a close call, Sallaz did enough to preserve his objection. He did clearly identify the portions of the magistrate judge's report he challenged. And contrary to the district court's contention that Sallaz referred the court "to the entirety of the brief and reply brief" filed before the magistrate judge, he cited the specific, limited page-ranges in his prior briefs laying out the relevant arguments. R.16, PID 551. We will therefore address the substance of Sallaz's objection.

### 2.

Dr. Miller adopted the results of the FCE by filling out a six-question form provided by Sallaz's counsel. Dr. Miller explained that he was treating Sallaz for "chronic lumbar back pain and post surgical hypothyroidism," and checked "yes" to indicate that he agreed with the FCE's results, believed that the FCE accurately reflected Sallaz's limitations from April 2019 on, and concluded that Sallaz "would be unable to perform any full-time occupations." R.7, PID 463. Where the form asked Dr. Miller to explain those conclusions, he wrote that Sallaz had "limitations in strength [and] repetitive behaviors," without any other elaboration or analysis. *Id.*, PID 464.

The ALJ found Dr. Miller's opinion "not persuasive for many of the reasons discussed in relation to the FCE." *Id.*, PID 59. Additionally, the ALJ identified problems with supportability

and consistency. As to the first, Dr. Miller's opinion offered "very limited" explanation for its adoption of the FCE's conclusions. And the terse explanation given—Sallaz's "limitation[] in strength"—was not consistent with Dr. Miller's repeated exam notes that Sallaz had "5/5" strength in his lower extremities. *Id.* The ALJ also found Dr. Miller's opinion unpersuasive because he failed to include any discussion of the leg pain or knee injections documented in his exam notes or the fact that after Sallaz resumed his appointments with Dr. Miller, he did not complain of back pain until June 2020.

Sallaz first argues that the ALJ's conclusion that Dr. Miller's opinion had limited supportability and consistency was not supported by substantial evidence. He contends that Dr. Miller's failure to discuss Sallaz's knee problems does not undermine his opinion because the knee problems were addressed by the FCE, which Dr. Miller "indicated he reviewed." Appellant Br. at 24. Second, although he acknowledges that Dr. Miller's explanation that Sallaz had strength limitations conflicted with the findings in his exam notes, Sallaz argues that the ALJ ignored other "contextual clues" in those exam notes that would have explained Dr. Miller's conclusion. *Id.* For example, during his June 2020 examination, Sallaz complained to Dr. Miller of "lower back weakness," and Dr. Miller found Sallaz's right leg had a limited range of motion. R.7, PID 428.

The ALJ's determination that a medical opinion with less than a sentence of explanation for its conclusions had little supportability and therefore limited persuasiveness was reasonable. Nor was it unreasonable for the ALJ to fail to intuit the basis for Dr. Miller's opinion from unexplained "context clues." And again, Sallaz's argument that Dr. Miller's strength limitation

was inconsistent with some portions of his exam notes, but potentially consistent with others, is not enough to demonstrate that the ALJ's decision was not supported by substantial evidence.[8]

Finally, Sallaz argues that the ALJ improperly interpreted "raw medical data"—the results of his August 2020 MRI—to reinforce her conclusion that Dr. Miller's exam notes demonstrated that he retained the ability to perform some sedentary work. Appellant Br. at 26. The ALJ concluded that the MRI results did "support a spinal impairment that could produce the alleged pain and leg numbness," but noted that they showed Sallaz did not have "any spinal canal stenosis or more than a mild neuroforaminal narrowing" in his spine. R.7, PID 53. The ALJ concluded that the MRI results together with Dr. Miller's notes from his September 2020 examination of Sallaz, which did not reflect severe impairment in his legs and back, were "not proportionate" with a level of pain and numbness preventing Sallaz from sitting continuously or standing and walking for short periods. *Id.*

The ALJ did not attempt to interpret raw data as Sallaz contends; rather, she relied on the narrative summary prepared by the radiologist interpreting the MRI results. And, although there is no analysis in the record from a medical source explaining how the absence of spinal stenosis or severe neuroforaminal narrowing would correspond to particular pain levels or physical limitations, in context, the ALJ's analysis rested not only on the MRI findings, but also on Dr. Miller's observations during a subsequent examination that Sallaz maintained strength and functioning in his lower extremities. The ALJ reached her conclusion after summarizing Dr. Miller's examination findings during Sallaz's two 2020 office visits. She concluded that "[t]hese

---

[8] Sallaz also argues that Dr. Miller's opinion was persuasive for reasons other than supportability and consistency—the length of time (nine years) Dr. Miller treated Sallaz, and Dr. Miller's medical qualifications. *See* 20 C.F.R. §§ 404.1520c(c)(3)(3)(i), (c)(4). Because the ALJ's analysis of the supportability and consistency of Dr. Miller's opinion—the "most important" factors in her analysis—was sound, these countervailing points do not require reversal. *Id.* § 404.1520c(b)(2).

medical signs"—*i.e.,* Dr. Miller's observations—"*and* findings on the MRI" were not proportionate with Sallaz's claimed limitations. *Id.*, PID 53 (emphasis added). The ALJ's conclusion that those examination findings indicated that the conditions revealed in the MRI did not preclude Sallaz from sedentary work was a reasonable one.

Sallaz has not shown that the ALJ erred in finding Dr. Miller's opinion unpersuasive.

## IV.

For the reasons set forth above, we **AFFIRM**.